IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| Francis Scott Key Lincoln/Mercury, Inc.<br>6001 Urbana Pike<br>Frederick MD 21701,<br><br>Plaintiff<br><br>v.<br><br>Ford Motor Company<br>1 American Road<br>Dearborn, MI 48126<br><br>Serve on Resident Agent<br>The Corporation Trust, Incorporated<br>351 West Camden Street<br>Baltimore, MD 21201,<br><br>Defendant | Civil Action No. _____<br><br>COMPLAINT AND JURY DEMAND |

For its Complaint against Defendant Ford Motor Company ("Ford"), Plaintiff Francis Scott Key Lincoln/Mercury, Inc. ("FSKLM") alleges the following:

NATURE OF THE CASE

1.      This is an action for damages by FSKLM against Ford pursuant to claims arising under the Maryland Transportation Code, §15-201, et seq.; the Automobile Dealers Day in Court Act, 15 U.S.C. §§1221-1226; and the common law.

PARTIES

2.      FSKLM is a Delaware corporation in good standing with its principal place of business at 6001 Urbana Pike, Frederick, Maryland 21704, where it operates an automotive dealership which includes the Lincoln and Mercury lines.

3.      Ford is a Delaware limited liability company with its principal place of business in Dearborn, Michigan.

4.      Since November of 1984, FSKLM has had a continuous franchise relationship with Ford under a Mercury Sales and Service Agreement with respect to Ford's Mercury brand and, pursuant thereto, operated as a Mercury dealership.

## JURISDICTION AND VENUE

5.      The Court has subject matter jurisdiction over this action (a) pursuant to 28 U.S.C. §1331 (federal question jurisdiction) and (b) pursuant to 28 U.S.C. §1332(a) in that there is a diversity of citizenship between the parties to this controversy, the value of which exceeds $75,000.

6.      The Court has jurisdiction over the state common law and statutory claims alleged herein.

7.      Venue is proper in the District of Maryland because FSKLM and Ford do business in this District, and the events giving rise to this action occurred principally in Maryland.

## FACTS COMMON TO ALL COUNTS

8.      FSKLM and Ford entered into a Mercury Sales and Service Agreement ("MSS Agreement"), dated November 27, 1984, pursuant to which FSKLM became authorized to function as a dealer for the sale and service of Mercury vehicles.

9.      At all times since the beginning of its Mercury franchise relationship with Ford, FSKLM has been in good standing and has substantially complied in all respects with all reasonable requirements of its relationship with Ford.

10.     As Ford's franchised dealer, FSKLM has, since the inception of the relationship,

operated effectively in fulfilling its responsibilities, including with regard to new and used

vehicle sales, parts and accessories sales and service operations, maintenance of Ford signage,

operation in approved facilities, and marketing and advertising.

11.     Throughout the franchise relationship, FSKLM has been one of the top three

volume "principal city" dealers in the State of Maryland and the Washington Lincoln Mercury

Region.

INVESTMENTS BY FSKLM

12.     FSKLM has over the years made very substantial investments, both initially and

continuously, to establish, maintain and grow its Mercury dealership.

13.     In particular, in 2002, the State of Maryland decided to take as part of their state

authority some of FSKLM's dealership property to build a highway.  FSKLM was in the process

of negotiating an all-cash settlement with the State when Ford's Regional Manager informed

FSKLM that if it purchased the Jaguar dealership then being operated by another dealer, and

relocated it to FSKLM's existing dealership, Ford would give FSKLM the rest of the Premier

Auto Group brands (i.e., Land Rover and Volvo), which were considered valuable.

14.     As a result, FSKLM then negotiated a purchase agreement with the owner of that

Jaguar dealership and had plans drawn up for the new Premier Auto Group facility.  To

accommodate Ford's request that it add the Jaguar dealership to its existing facility and become

part of the Premier Auto Group, FSKLM negotiated with the State of Maryland to give FSKLM

more land instead of an all cash settlement.

15.     FSKLM was then directed to appear for a meeting with the Premier Auto Group

in Irvine, California.  However, Ford – after prompting FSKLM to acquire the Jaguar dealership

and informing it that if it relocated the Jaguar dealership to its existing location, Ford would grant it the rest of the Premier Auto Group brands – exercised its right of first refusal and took the Jaguar dealership away from FSKLM, precluding it from establishing a Premier Auto Group facility. Ford and FSKLM reached a settlement as a result of Ford's actions, with FSKLM being granted a Volvo franchise.

16.     Subsequently, Ford required FSKLM to construct a new Gallery Design facility, which was a new upscale facility that would expand the size of the existing facility from approximately 10,000 square feet to 35,000 square feet. The value of the construction costs was approximately $5.5 Million. The Ford Regional Manager participated in many of the hearings with the State of Maryland and testified that Ford would require that the new facility be built or it would terminate FSKLM's franchises.

17.     The facility that previously existed would have been adequate for the dealership's original anticipated volume but Ford required the construction of the new facility to accommodate the three franchise lines: Mercury, Lincoln and Volvo.

18.     The new facility, built at the insistence of Ford, is a state-of-the-art sales and service facility and is one of only three new Gallery Design facilities in the State of Maryland. Over 20 vehicles can be displayed in the indoor showroom and over 250 can be displayed outside on the premises.

19.     FSKLM's new Gallery Design facility was developed only because Ford required it and FSKLM invested in the new facility as a result of assurances from Ford of the future viability of the Mercury and Lincoln brands.

20.     FSKLM was presented with the 2006 Gallery Design Facility Award by Darryl Hazel, President of Ford's Lincoln-Mercury Division.

FORD'S NOTICE OF TERMINATION OF THE MERCURY BRAND

21.    On January 26, 2010, Ford CEO Alan Mulally reaffirmed Ford's support of and loyalty to its Mercury brand, stating at the Washington, D.C. auto show that Mercury is "important and profitable" for Ford.

22.    In February 2010, during a National Automobile Dealers Association Convention, Ford executives represented to Mercury dealers that it was committed to adding a new model vehicle, the Tracer, to the Mercury line-up in 2011.

23.    The Mercury Tracer was to be the first new Mercury model introduced in five years, and was touted by Ford as part of its strategy to support the Mercury brand in the growing small-car segment.

24.    Then, on or about June 2, 2010, Ford sent to FSKLM: a letter from Kenneth M. Czubay entitled "Mercury Discontinuance," a "Mercury Resignation Benefits Offer" signed by David R. Kelleher ("MRBO"), a proposed form of Settlement Agreement, and a Notice of Termination ("Notice").

25.    Upon information and belief, all Mercury dealers nationwide received communications substantially identical to those received by FSKLM, differing only in the compensation amounts offered by Ford to the dealer.

26.    The "Mercury Discontinuance" letter announced Ford's decision to discontinue the Mercury brand and the production and sale of Mercury vehicles, and enclosed the MRBO, the Notice, and a proposed Settlement Agreement.

27.    The Notice stated, in part:

   This notice is being sent to you pursuant to Paragraph 17 of the
   Standard Provisions of the Mercury Sales and Service Agreement
   (the "Dealer Agreement") and applicable law.  Effective on

December 31, 2010, the Dealer Agreement shall terminate, without further action or notice of any kind.

* * *

In order to minimize any disruption to our dealer body, we are offering a comprehensive benefits package to all Mercury dealers who resign their Mercury franchise. You are receiving a customized description of that package as it applies to your dealership.

28.     In the "comprehensive benefits package," <u>i.e.</u>, the MRBO, Ford offered monetary compensation to FSKLM in the aggregate amount of $181,026, inclusive of a Mercury Sales Credit and a Mercury Parts Return Credit.

29.     The MRBO was grossly inadequate as any purported payment for the harm to FSKLM as a result of the unilateral termination of the Mercury brand, which was done solely by Ford for its own purpose.

30.     The MRBO described the methodology used by Ford to reach its dollar amounts for sales and parts credits:

(a)     As to Mercury Sales Credit: "This is a one-time payment based on (i) the average number of Mercury new vehicle retail sales reported by your dealership during the calendar years 2007-2009 (the 'Mercury Unit Multiplier'), multiplied by (ii) a per unit amount based on the average percentage of your total reported Ford, Mercury and/or Lincoln new vehicle retail sales generated by your new Mercury vehicle retail sales during that same three-year period (the 'Mercury Share of Business Percentage')."

(b)     As to Mercury Parts Return Credit: "resigning dealers will be given a parts 'credit' payment calculated as follows: the value of each dealer's Ford/Mercury and, where applicable, Lincoln parts inventory, as certified by your dealership, and set forth in your dealership's April 2010 Inventory Management Allowance closing parts inventory ..., multiplied by your Mercury Average Share of Business Percentage, as described above."

(c)     As to Mercury signage:

     i.     Ford will remove and replace only Lincoln-Mercury or Mercury pole mounted and monument mounted brand signs acquired through the Ford Retail Identification Program ("FRIP");

     ii.    Ford will remove but not replace Mercury trademarked signs, wall mounts, letters, and icons acquired through FRIP; and

     iii.   Dealers remain responsible for, and do not receive any reimbursement for, any other Lincoln-Mercury or Mercury signage.

31.     The MRBO states that the Mercury Sales Credit formula "is intended to recognize and compensate dealers for the different levels of contribution Mercury made to their Ford- and/or Lincoln-related businesses."

32.     Nothing in Ford's explanation of its offer even purports to offer FSKLM the fair market value of its business as a going concern or to make it whole, in terms of the monetary and business harm that would result from Ford's action in terminating FSKLM's Mercury franchise.

33.     No one from Ford has indicated to FSKLM that Ford even believes that the offered amount is an approximation of the fair market value of FSKLM's lost business due to the Mercury termination or any attempt at quantifying the degree of injury.

34.     Rather, upon information and belief, Ford's individual offers to the dealer network was based on an overall determination by Ford of what it arbitrarily and unilaterally determined to pay to all Mercury dealers.

35.     Although Ford in the MRBO stated that it believes that dealers will find the offer "fair and reasonable," FSKLM has seen nothing from Ford that justifies its offer, which is grossly inadequate to compensate FSKLM for the harm that will result from the loss of the Mercury line.

FSKLM'S APPEAL TO FORD'S DEALER POLICY BOARD AND ITS DECISION

36.     Under the MSS Agreement (¶18(b)), FSKLM's appeal to the Ford Dealer Policy

Board ("Policy Board") in response to Ford's notice of termination of the Mercury brand is a

condition precedent to FSKLM's rights to pursue other available remedies.

37.     On or about June 7, 2010, FSKLM filed with the Policy Board its appeal of

Ford's decision to terminate its Mercury franchise.

38.     The Policy Board heard FSKLM's appeal on October 5, 2010.  In its decision

dated November 22, 2010, the Policy Board erroneously decided that it did not have jurisdiction

to rule, reasoning that the Mercury termination and the methodology to compute offers "are akin

to Company policies that affect all Mercury dealers," and are not unique to FSKLM.  Nothing in

the MSS Agreement limits the Policy Board's jurisdiction to matters that are "unique" to

individual dealers.  The Policy Board also concluded erroneously that FSKLM's claim relating to

Ford's requiring the building of the Gallery Design facility "was not submitted promptly," even

though the claim arose only as a result of Ford's recent termination of FSKLM's Mercury

franchise.

39.     FSKLM has satisfied any purported contractual condition precedent prior to

seeking relief before this Court.

FIRST COUNT
(Violation of the Maryland Transportation Code)

40.     FSKLM incorporates and re-alleges paragraphs 1-39 above as if fully set forth

herein.

41.     FSKLM is a "dealer," and Ford is a "manufacturer," within the meaning of those

terms as used in the Maryland Transportation Code, §§15-101(c) and 15-201(e).

42.     The MSS Agreement is a "franchise" within the meaning of that term as used in the Maryland Transportation Code, §11-125.

43.     The Maryland Transportation Code provides protection for automobile dealers from unfair and unreasonable acts by automobile manufacturers.  Specifically, §15-206.1(b) of the Maryland Transportation Code provides that

> A manufacturer, distributor, or factory branch, whether directly or through an agent, employee or representative, may not fail to act in good faith:
>
> (1)  In acting or purporting to act under the terms, provisions, or conditions of any franchise agreement; or
>
> (2) In any transaction or conduct governed by this subtitle.

Section 15-206.1(a) of that Code defines "good faith" to mean "honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade."

44.     Section 15-209 of the Maryland Transportation Code provides that a "manufacturer may not terminate, cancel, or fail to renew the franchise of a dealer, notwithstanding any term or provision of the franchise, unless:  (1) the dealer has failed to comply substantially with the reasonable requirements of the franchise; and [(2) the manufacturer complies with the notice requirements set forth in the Code]".

45.     Section 15-209(f)(1) of the Maryland Transportation Code provides:

> In addition to any administrative and criminal sanctions imposed under this subtitle, a manufacturer, distributor, or factory branch that terminates, cancels, or fails to renew the franchise of a dealer in violation of this section shall pay to the dealer the <u>fair value of his business as a going concern</u>.  (Emphasis added.)

46.     Section 15-212.2(a) of the Maryland Transportation Code provides for various payments and reimbursements to be made by a manufacturer which terminates a dealer's franchise, even if the termination is not in violation of the Code.

47.     Further, Section 5-213 of the Maryland Transportation Code provides that if any person "suffers financial injury or other damage as a result of a violation of this subtitle by any other person, ... the injured person may recover damages and reasonable attorneys' fees in any court of competent jurisdiction."

48.     FSKLM has complied with all reasonable requirements imposed by the MSS Agreement and any other agreements ancillary thereto.

49.     Ford's actions are in violation of the above-enumerated sections of the Maryland Transportation Code.

50.     Ford's decision to terminate FSKLM's Mercury franchise, and to make the "offer" described above, was not "in good faith," as required by §15-206(1)(b) of the Maryland Transportation Code, in that, among other things, (a) the termination was not based on any failure by FSKLM to comply with the requirements of the franchise and, in fact, nowhere does Ford even suggest that this was the basis of the decision; (b) the decision was made after Ford required FSKLM to expend millions of dollars building a new Gallery Design facility intended to be used for the Ford Premier Auto Group brands, which included the Mercury brand; (c) the "offer" failed to take into account the substantial investment required only a few years earlier to be made by FSKLM in the facility; and (d) the "offer" failed to provide FSKLM the fair value of its Mercury business as a going concern.

51.     Ford's decision to terminate FSKLM's Mercury franchise is in violation of the requirement in §15-209(a)(1) of the Maryland Transportation Code in that FSKLM has not failed to comply substantially with the reasonable requirements of the franchise and this was not even the basis for Ford's decision to terminate FSKLM's Mercury franchise.

52.     Ford's actions are in violation of the requirement in §15-209(f)(1) of the Maryland Transportation Code in that Ford has not offered or agreed to pay FSKLM the fair value of his Mercury business as a going concern.  In fact, the "offer" made in the MRBO does not even approach a "good faith" measurement of the fair value of the Mercury business.

53.     Ford's actions are in violation of the requirements in §15-212.2(a) of the Maryland Transportation Code in that the "offer" failed to provide FSKLM the payments and reimbursements required by that provision.

54.     Ford is therefore liable to FSKLM, pursuant to §15-213 of the Maryland Transportation Code, for all "damages" resulting from Ford's violations of the Code, including, but not limited to, the fair value of the Mercury franchise as a going concern, the economic loss from the substantial investment made in the new facility which can no longer be used for the Mercury franchise, the present value of the past and future increase in rent expense for the new facility, the lost return on the investment in the Mercury franchise, lost profits (i.e., sales of new cars, used cars, parts and service), loss of goodwill and lost cross-selling opportunities for FSKLM's other brands.  FSKLM has already received an expert's estimate of some of these damages as being in excess of $2.9 million.

55.     FSKLM is also entitled to recover interest on its damages, its reasonable attorneys' fees, and all costs of this action.

### SECOND COUNT
(Violation of the Automobile Dealers Day in Court Act)

56.     FSKLM incorporates and re-alleges paragraphs 1-55 above as if fully set forth herein.

57.     On or about November 27, 1984, FSKLM and Ford, an automobile manufacturer engaged in commerce, entered into the MSS Agreement.

58.     The MSS Agreement created a franchise relationship between FSKLM and Ford and established FSKLM as a franchised Mercury dealer.

59.     At all times relevant to the conduct set forth in this complaint, Ford has failed to act in good faith in performing and/or complying with the terms and provisions of the MSS Agreement in violation of the Automobile Dealers Day in Court Act, 15 U.S.C. §§1221-1226 ("ADDCA").

60.     Specifically, Ford has failed to act in good faith toward FSKLM by, among other things,

(a)     using the threat of imminent termination of FSKLM's Mercury franchise to attempt to coerce FSKLM into releasing all claims against Ford, accepting the grossly inadequate offer set forth in the MRBO, and foregoing its statutory rights and remedies under the ADDCA, as well as under other statutes and the common law;

(b)     terminating FSKLM's Mercury franchise, receiving nothing in return and losing all value in its franchise, because FKLM refused to accept Ford's inadequate offer;

(c)     the decision to terminate FSKLM's Mercury franchise was made after Ford required FSKLM to expend millions of dollars building a new Gallery Design facility intended to be used for the Ford Premier Auto Group brands, which included the Mercury brand; and

(d)     the "offer" failed to take into account the substantial investment required only a few years earlier to be made by FSKLM in the facility.

61.     In connection with the termination of FSKLM's Mercury franchise, Ford has acted unilaterally and coercively, through unfair and inequitable conduct, and not in a fair, legal, and honest fashion, thereby damaging FSKLM's business, sales and reputation.

62.     By these coercive acts, Ford has violated its obligation of good faith under the ADDCA.

63.     These coercive acts have caused and continue to cause FSKLM very substantial economic injury.

64.     Ford is liable to FSKLM for these violations of the ADDCA.

THIRD COUNT
(Tortious Interference With Present and Prospective Economic Advantage)

65.     FSKLM incorporates and re-alleges paragraphs 1-64 above as if fully set forth herein.

66.     FSKLM has had a reasonable expectation of economic advantage and/or benefit with respect to continuing the Mercury business.

67.     FSKLM expected to have business operations with respect to the retailing of Mercury vehicles and parts and providing associated services, including, but not limited to, numerous business and customer relationships and transactions with the consuming public.

68.     The explicit termination of FSKLM's Mercury franchise has profoundly interfered with and harmed FSKLM's ability to provide Mercury vehicles and parts, and associated services, to the consuming public and other third parties.

69.     Ford had full knowledge of FSKLM's expectancy, an expectancy that was reasonable, foreseeable, and known to Ford.

70.     Ford's Notice, MRBO, and proposed Settlement Agreement, with their onerous and unlawful provisions, are a wrongful and intentional interference with FSKLM's legitimate

and reasonable expectancy, and a deliberate scheme and attempt to quash FSKLM's economic expectations.

71.     Ford's interference, without justification or excuse, has caused FSKLM to suffer the loss of the prospective economic gain.

72.     Ford has interfered with FSKLM's prospective economic advantage by destroying and intending to destroy FSKLM"s ability to do business with third parties.

73.     Accordingly, Ford has tortiously interfered with FSKLM's economic advantage, and thereby caused and continues to cause economic harm to FSKLM.

FOURTH COUNT
(Promissory Estoppel Against Ford)

74.     FSKLM incorporates and re-alleges paragraphs 1-73 above as if fully set forth herein.

75.     Ford made statements regarding continuing its Mercury business which induced FSKLM to invest substantial amounts of money to expand its operations.

76.     The inducement caused FSKLM to invest substantial resources in its Mercury business, including, but not limited to, building its Gallery Design facility at a cost in present value of approximately $5.5 million.

77.     FSKLM reasonably and justifiably relied upon Ford's statements, and upon the course of conduct over a period of more than 25 years.

78.     FSKLM has suffered definite and material detriment and damage in reliance on Ford's statements, causing substantial economic harm to FSKLM.

79.     Ford is estopped from denying that it made clear and definite statements to induce and did in fact induce FSKLM to expand its operations based upon Ford's representations regarding continuing its Mercury business.

### FIFTH COUNT
### (Equitable Estoppel Against Ford)

80.     FSKLM incorporates and re-alleges paragraphs 1-79 above as if fully set forth herein.

81.     Ford made representations of material fact concerning Ford's continuation of its Mercury business.

82.     Ford conducted itself deceptively in making those representations.

83.     Ford conducted itself with the intent that FSKLM would rely upon Ford's course of conduct, consistent with the continuation of viable Mercury franchises, and FSKLM so relied.

84.     FSKLM has suffered definite and material detriment and damages in reliance on Ford's actions.

85.     Ford is estopped from denying its course of conduct that led FSKLM to believe in the continuing viability of the Mercury brands.

### PRAYER FOR RELIEF

WHEREFORE, FSKLM demands:

(1)     With respect to the First Count, judgment against Ford, declaring the unlawfulness of Ford's termination of FSKLM's Mercury franchise; for compensatory (including, but not limited to, the fair value of the Mercury franchise as a going concern), consequential and incidental damages in an amount in excess of $2.9 million; and for pre- and post-judgment interest;

(2)     With respect to the Second Count, a judgment against Ford, declaring Ford's actions to be in violation of the Automobile Dealers Day in Court Act; for compensatory, consequential and incidental damages in an amount in excess of $2.9 million; and for pre- and post-judgment interest;

(3)     With respect to the Third Count, judgment against Ford, declaring Ford to be liable to FSKLM for tortiously interfering with its present and prospective economic advantage; for compensatory, consequential, and incidental damages in an amount in excess of $2.9 million; for punitive damages; and for pre- and post-judgment interest;

(4)     With respect to the Fourth Count, judgment against Ford, declaring that Ford is liable to FSKLM based on a promissory estoppel theory; for compensatory, consequential, and incidental damages in an amount in excess of $2.9 million; and for pre- and post-judgment interest;

(5)     With respect to the Fifth Count, judgment against Ford, declaring that Ford is liable to FSKLM based on a equitable estoppel theory; for compensatory, consequential, and incidental damages in an amount in excess of $2.9 million; and for pre- and post-judgment interest;

(6)     All costs and attorneys' fees; and

(7)     Such other and further relief as the Court deems just and proper.

<u>JURY DEMAND</u>

FSKLM hereby demands a trial by jury on all issues of the Complaint so triable.

Respectfully submitted,

**DLA PIPER LLP (US)**

By _____

Barry M. Heller (Bar No. 6494)
1775 Wiehle Avenue, Suite 400
Reston, VA 20190-5159
Telephone (703) 773-4245
Facsimile (703) 773-5056

Date: 1/12/11

*Attorneys for Plaintiff*